[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 8, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-15557
Non-Argument Calendar

_____

Agency Nos. A97-203-819
and A97-203-820

BEN LONGCHAR,
IMDONGYBANG MEXISENLA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(May 8, 2006)**

Before CARNES, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Ben Longchar and his spouse, Imdongybang Mexisenla, Indian nationals, petition for review of the Board of Immigration Appeals' decision affirming an Immigration Judge's order of removal and denial of their asylum and withholding of removal claims, as well as relief under the United Nations Convention Against Torture. On appeal, they argue that substantial evidence proved that they suffered past persecution and had a well-founded fear of future persecution based on their Christian religion. For the reasons set forth more fully below, we deny the petition.

Longchar, the lead petitioner, entered the United States on September 4, 1995, as a non-immigrant student to attend the "S.E. Theological Seminary" in Wake Forest, North Carolina. Mexisenla, the derivative petitioner, entered the United States on or about January 22, 1996, as a non-immigrant with F-2 status to remain in the United States for a temporary period not to exceed December 1, 2002. It appears that Longchar, including his spouse, Mexisenla, filed an application for asylum and withholding of removal signed May 21, 2003, alleging persecution on account of their religion and political opinion.[1] On July 8, 2003,

---

[1] It is noted that Longchar also filed for cancellation of removal, as he had been in the United States for more than 10 years, and the claim was denied after the removal hearing. Longchar does not appeal the denial of his cancellation claim, and, therefore, the facts supporting that claim are not discussed in this opinion because the claim is deemed abandoned on appeal. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1231, 1232 n.2 (11th Cir. 2005). We further note that Longchar does not offer any argument regarding the denial of CAT relief, and that claim is also deemed abandoned. Id.

both petitioners were served with notices to appear. Longchar was charged with failing to maintain or comply with the conditions of his non-immigrant status, specifically failing to continue to attend the Theological Seminary, in violation of INA § 237(a)(1)(C), 8 U.S.C. § 1227(a)(1)(C). Mexisenla was charged with remaining in the United States for a longer time than permitted, a violation of INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). The petitioners admitted to the allegations in their notices to appear and conceded removability.

In his application, Longchar (used herein to refer to both petitioners) stated that he was a Christian Missionary Pastor, and that the government of India supported members of the Hindu faith that persecute Christians like himself. He feared that, if returned to India, he would be kidnaped and arrested and his wife would be raped by the government and religious sects because of his past, current, and future spiritual beliefs. In support, Longchar stated that he personally had been beaten, abused, and attacked in India, and that his brother-in-law and uncle had as well. He further stated that he was a member of the Community Democracies movement and continued to assist Christians in India by sending leaflets and literature.

Longchar included a personal statement indicating that, on August 6, 1986, while he was in college, four men who he believed were hired hands entered his

3

apartment, said they were there to "settle a matter," and beat him until he laid motionless. One of the men said, "He's dead, let's go." Longchar believed that the men attacked him because he had befriended two Hindu classmates who went to church with him, although they were not converted, as well as his relationship with another Hindu who was converted to Christianity after Longchar invited the friend to attend a Christian youth camp. In 1997, Longchar's brother-in-law, also a Christian, was kidnaped and attacked by "gangsters," but escaped after his captors discovered that he was carrying a large sum of money. In 1998, another brother-in-law had his home ransacked by Indian soldiers during a prayer meeting, and after Christian literature was discovered, three members of the prayer group were taken away, beaten, and tortured.

Among the various exhibits submitted was the 2003 State Department Report on Human Rights Practices for India. India was described as a parliamentary democracy led by the "BJP" party, and, while the 28 individual state governments had primary responsibility for law and order, the central government provided guidance and support through the use of paramilitary groups. While human rights were generally respected, the report noted problems with religiously motivated violence against Muslims and Christians.

In the "Freedom of Religion" section, the report noted that, although "the

4

law provides for religious freedom, enforcement of the law was poor, particularly at the state and local levels." The report further noted that the ruling party, the BJP, had links to extremist Hindu groups that were implicated in violent acts against Christians and Muslims, although there was no evidence that the government itself was complicit in the violence. Tensions between Muslims and Hindus and Hindus and Christians continued throughout the year, although attacks on religious minorities decreased overall. The government was, however, criticized for its failure to restrain Hindu extremists. Notwithstanding the Hindu nationalists, Christian leaders reported a decrease in violent incidents, and the report further noted that where Christians comprised a majority, Christians were sometimes the oppressors.

Next, Longchar submitted a 2004 report by the United States Commission on International Religious Freedom. It listed India among the 11 countries recommended for placement on the list of "Countries of Particular Concern" for "the systematic, ongoing, and egregious violations of religious freedom that the governments are responsible for or have tolerated." The report noted that violence, including fatal attacks, against Muslims and Christians continued, and several members of the central government were known to have allied themselves with extremist Hindu groups. Three members of the Commission, however, dissented

5

from designating India as a "Country of Particular Concern," finding that India had the legal and democratic traditions to deal with religious intolerance, and, in fact, significant steps had been taken to correct insufficient actions taken against religious extremists who used violence against minority religions.

Also included was the State Department's 2003 International Religious Freedom Report. It reported that, while there was a decrease in the number of incidents of Hindu-Christian violence, the passage of "anti-conversion" laws increased the likelihood of religious intolerance. It noted that the central government is led by a coalition that has pledged to respect India's traditions of secular government and religious tolerance, but that the leading party was the BJP, a Hindu nationalist party with links to extremist groups. Out of a population of roughly 1 billion people, Christians comprise 2.3 percent, or 23 million people, concentrated in six states, including Nagaland. The central government generally respected the right to religious freedom, although it was noted that state and local governments only partially respected that freedom. Most attacks against Christian groups were perpetrated by Hindu extremist groups or mobs. The report also indicated that two Indian states (not Nagaland) had passed "anti-conversion" laws that criminalized alluring people to convert religions. However, in northern India, only a few isolated incidents involving attacks on religious minorities were

reported.

Moreover, the report stated that there was no national law barring a citizen or foreigner from professing or propagating his or her religious beliefs, although actual preaching required permission. The central government was not implicated in any abuse of religion, although it was criticized by human rights activists for "indifference and inaction" in the face of state and local abuses. The report concludes, however, that "[d]espite the incidents of violence and discrimination during the period covered by this report, relations between various religious groups generally are amicable among the substantial majority of citizens. There are efforts at ecumenical understanding that bring religious leaders together to defuse religious tensions." Longchar submitted numerous articles, as well as an e-mail, discussing local detentions of Christian priests, general, non-religious tensions, and the actions of extremist Hindu groups.

Also included in the record was a June 1996 Bureau of Democracy, Human Rights and Labor report on India's country conditions and asylum claims. The report states, in relevant part, that Christians occasionally encounter prejudice and harassment as a minority religion. However, while an occasional church is destroyed, "Christians are generally able to live and worship without serious difficulty. The Government makes no effort to infringe on the rights of Christians,

7

and only fanatical Hindus or Muslims are concerned about Christian activities." The report further notes that proselytizing is illegal. The report concludes that "Indians of Christian faith are not generally in a position to show that they have suffered abuse in India and that this abuse would occur wherever they might live in that country."

At the removal hearing, Longchar testified that he was born and lived in Nagaland, India, located in the Northeast of the country near China. According to Longchar, Nagaland became part of India in 1963, and, as a region, maintains a population of 4 million, and has only two "major" cities with electricity and running water. Longchar lived in Moguptun, which would be considered one of the bigger cities. He came to the United States on January 18, 1990,[2] and obtained a Masters degree in Divinity. Longchar continued his education at a Theological Seminary, but it ended when he failed to complete his thesis by its deadline and was denied an extension.

After the extension was denied, Longchar filed for asylum, fearing that he and his family would be persecuted because of his involvement as a Christian. Longchar testified that, on August 6, 1986, four people entered his apartment and

_____

[2] This date is different than the one listed in his notice to appear, but this is a moot point since no one disputes that he was removable as charged. In fact, Longchar first arrived in the United States in 1990, but made two trips to India, and last entered the United States on September 4, 1995, the date listed on the notice to appear.

beat him up, and his "only crime" was that he had been active in reaching out to Hindus. Longchar did not know the names of his attackers, but did recognize one of the faces. The attackers, upon entering Longchar's apartment, explained that they had a "matter to settle" and then began beating him, hitting him with their hands and kicking him until two of the men declared that Longchar was dead. Longchar received minor injuries and was treated at a local hospital.

Longchar reported the incident, but testified that "nothing happened." When further questioned, Longchar admitted that the police may have investigated the incident, but that no arrests were ever made. Longchar then testified that his involvement in Christian activities is what prompted the attack, and further stated that Christians have always been persecuted, including at the hands of the authorities. When asked how he knew that the attackers were Hindu, Longchar testified that he was sure of only one thing: that they were not Christians and were hired by the Hindus. He also said that the attackers spoke Hindu and "Nogamese." However, the only thing Longchar thought could have prompted the incident was his involvement. Other than saying they had a "matter to settle," the attackers did not indicate why they were there. Nothing else happened to him during the four years he remained in India.

As for his fear of returning to India, Longchar testified that he had been

involved in sending Christian books and other literature to India and feared that his work in actively promoting Christianity would make him a target for persecution. Longchar testified that he knew others who had been persecuted for their Christian beliefs, including his youngest brother-in-law, who was holding a prayer meeting one day when the Indian army ransacked his home and found Christian literature that Longchar had sent. They then spotted a pocket knife and accused the people there, not of being Christians, but of participating in the "freedom movement of Nogas" and standing against the Indian government. They were then tortured and beaten for being freedom fighters of Nagaland. As for the Indian army's involvement, Longchar testified that they were sent to battle the freedom movement, but that was a pretext for persecuting Christians.

Longchar also testified that his uncle, who was a church deacon, returned home one night and was confronted by a group of soldiers who just beat him up, and several months later, he died. According to Longchar, the soldiers came for his uncle because his uncle was active in the church, and Longchar had been sending Christian literature to his uncle. The literature was used to help teach Hindus what Christianity was "all about." Longchar's relatives informed him that the Indian army knew that Longchar was the source of the Christian resources, and that he should be careful. When asked how the Indian army would know him as

the source, Longchar stated that his address was on the boxes, and the boxes were found in his uncle's home. If returned to Nagaland, Longchar believed that he might be arrested, persecuted, or tortured, and his wife might be raped or ill-treated because of his involvement in the Christian activities and for exposing the "wickedness . . . , human rights violations, and religious rights violations."

The IJ then asked if Longchar could go somewhere in India other than Nagaland, and Longchar testified that he would be even less safe outside of Nagaland because if he was not safe in his own home, he would "not be safe anywhere else in India." He testified that Christians were persecuted everywhere in India, and that the police themselves were involved in persecuting minorities. Longchar further explained that the current government of India, the "B.J.P.," was supported by extremist Hindus, and it wanted to make Hinduism the state religion of India.

On cross-examination, Longchar indicated that Nagaland has a very high percentage of Christians. He further admitted that the conflict between religions was worse in the rural areas than in the big cities, and that large populations of Christians exist in both the Northeastern States and in the South of India.

The IJ rendered an oral decision, first finding that Longchar's asylum application, while filed more than one year after entering the United States, was

11

not time-barred. The IJ next found that the 1986 attack described by Longchar did not constitute past persecution on the basis of his religion. The IJ found that Longchar's testimony failed to provide an objective basis from which to conclude that the attack was motivated because of Longchar's Christianity and Christianity-based activities. This finding was bolstered by the fact that Longchar was never again confronted by anyone prior to leaving India in 1990, suggesting that, if the motivations of his attackers truly had been related to Longchar's Christianity, he should have faced similar problems over the four-year period preceding his move to the United States.

As to a well-founded fear of future persecution, the IJ found that, while Longchar sent Christian literature to his uncle and the government seized this literature, there was nothing in the record demonstrating that the government of India would logically conclude that Longchar was complicit in the distribution of these materials to non-Christians. Even if the Indian government made the connection, however, the IJ found that there was not a sufficient basis for concluding that the government would have an interest in taking action against Longchar given that five years had elapsed and Longchar's uncle was deceased, preventing any further literature from being distributed. Looking at the various country reports, the IJ found that the principle violence in India was between

Hindus and Muslims, and that there was evidence that Christians were generally able to live and worship without government interference, as only "fanatical Hindus or Moslems" were concerned with Christian activities. The IJ further noted that there were reports that the relations among various religious groups generally were amicable for a substantial majority of the population, and attacks against Christians had decreased since the year 2000. With respect to Nagaland, the IJ found that the area was largely Christian, and the fact that there was a military presence to combat government insurgents was not a sufficient basis for granting asylum. The IJ also found that adhering to the Christian faith in India was not a sufficient basis by itself for granting asylum. Thus, the IJ found that Longchar and his wife had failed to prove that they were "refugees" within the meaning of the INA, and further had failed to demonstrate eligibility for withholding of removal and CAT relief.

Longchar appealed to the BIA, arguing essentially that the IJ erred by denying Longchar asylum, withholding of removal, or CAT relief because the evidence demonstrate both past persecution and a well-founded fear of future persecution, as demonstrated by reports showing violence and hostility against Christians. The BIA dismissed Longchar's appeal and found that, assuming Longchar's testimony was credible, he failed to establish past persecution on the

basis of a protected ground because the motivations for the attack were purely speculative and not based on any verifiable proof. Finally, it agreed with the IJ's finding that, based upon an evaluation of the country conditions, Longchar failed to demonstrate a well-founded fear of future persecution or torture in India.

On appeal, Longchar argues that the IJ erred by finding that he did not suffer past persecution because the evidence of the country conditions demonstrated that Christians are the target of persecution in India, and he testified that he was himself beaten for sharing his Christian faith with others. He next argues that the cumulative acts of violence and harassment can amount to persecution, especially in the instant case because, based on objective evidence, the government of India is unable or unwilling to control persecutors of Christians. Longchar then argues that, because he suffered past persecution, he is entitled to a presumption of a well-founded fear of future persecution. Alternatively, Longchar argues that his testimony combined with the background material submitted demonstrates that he is "very likely" to suffer future persecution if returned to India because he is a Christian and is known to have preached Christianity. Next, Longchar argues that he is entitled to relief because the record demonstrates a "pattern and practice" of persecution of groups similarly situated to his own. Longchar then argues that his testimony regarding the motive of his attackers, even if unsubstantiated, is

14

supported by the evidence of the general country conditions in India, and, therefore, he has established past persecution. Lastly, Longchar argues that he is entitled to withholding of removal because the government did not overcome the presumption of a well-founded fear and it is more likely than not that he will be persecuted because of his religious beliefs if returned to India.

We review only the BIA's decision, except to the extent that it expressly adopts the IJ's opinion. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (citation omitted). To the extent that the IJ's decision was based on a legal determination, review is de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001). The IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Al Najjar, 257 F.3d at 1283-84 (citation omitted). Thus, factual determinations "may be reversed by this court only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004).

An alien who arrives in or is present in the United States may apply for asylum. See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Secretary of Homeland

15

Security or the Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). A "refugee" is:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. . . .

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (emphasis supplied). The asylum applicant carries the burden of proving statutory "refugee" status. See Al Najjar, 257 F.3d at 1284. To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor, in this case political opinion, will cause such future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. The INA does not expressly define "persecution" for purposes of qualifying as a "refugee." See INA § 101(a)(42), 8 U.S.C. § 1101(a)(42). However, this Court has discussed other circuits' holdings that "persecution" is an "extreme concept," requiring more than "a few isolated incidents of verbal harassment or intimidation," or "[m]ere harassment." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005).

16

A showing of past persecution creates a presumption of a "well-founded fear," subject to rebuttal by the INS. 8 C.F.R § 208.13(b)(1). A "well-founded fear" of persecution may also be established by showing a reasonable possibility of personal persecution that cannot be avoided by relocating within the subject country. 8 C.F.R. § 208.13(b)(2)(i) & (ii). It is "well-established" that the well-founded fear inquiry contains both an objective and subjective component, i.e., the petitioner must be genuinely afraid and that fear must be objectively reasonable. Al Najjar, 257 F.3d at 1289. Furthermore, it is the petitioner's burden to present "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution." Id. at 1287 (internal quotation, emphasis, and citation omitted).

As for withholding of removal, an alien "must show that his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion." Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437 (11th Cir. 2004). "An alien bears the burden of demonstrating that he more-likely-than-not would be persecuted or tortured upon his return to the country in question." Id.

As to past persecution, Longchar's testimony was that, on August 6, 1986, he was beaten by four people he did not recognize over a "matter to settle." The

17

only "matter" that Longchar could point to was that he had been reaching out to Hindus. He further indicated that it was his belief that his attackers were not Christians and were hired by the Hindus. Thus, Longchar's testimony established only that he thought the attackers were beating him for his Christian activities, and stopped beating him only after he appeared to be dead. Longchar was treated for only minor injuries and lived without incident in India for four more years before coming to the United States. During the four years following his beating, it does not appear that Longchar stopped being Christian or stopped participating in Christian activities, but nevertheless, he never again was assaulted by anyone.

On this record, it cannot be said that the BIA's determination that Longchar failed to prove that he was attacked because of his Christianity compels a reversal. The fact that the country reports indicate that there exists some violence between Hindu extremists and Christians does not prove that Longchar's attack was religiously motivated, and the absence of any further attacks against him for four years following the attack supports the BIA's finding that Longchar's testimony regarding why he was attacked was speculative and non-specific.[3] In fact, Longchar's interpretation of the country reports would mean that every Indian Christian who was ever attacked for any reason whatsoever would be a victim of

___

[3] It is noted that there is no objective evidence of what the country conditions of India were back in 1986, when Longchar was beaten.

18

past persecution without having to demonstrate a specific nexus between the attack and his religion.

Furthermore, Longchar's argument that the cumulative acts of violence, uncontrolled or unabated by the government of India, proved his past persecution is unavailing. Longchar does not cite any Eleventh Circuit precedent on point, but rather relies on In re O-Z- & I-Z-, 22 I&N Dec. 23, 25-26 (BIA 1998), where the BIA found that a Jewish petitioner had established that his son was beaten severely enough to require surgery, his furniture and possessions stolen or destroyed, anti-Semitic flyers were delivered to his apartment, and his son was forced to undress in front of classmates, and each of these events were tied specifically to anti-Semitism or an anti-Semitic group. The BIA concluded that, in the aggregate, the incidents established past persecution. Id. at 26.

Unlike in O-Z & I-Z-, Longchar's testimony was that he was attacked one time, and the motivations for the attack were unclear. Here, there is nothing to take "in the aggregate," as there are no specific instances other than the one beating he received. Thus, Longchar's case is factually distinguishable from O-Z- & I-Z-, and the harm suffered by Longchar was not as great or greater than the harm suffered by the petitioner there, nor was it, as noted above, tied explicitly to his religious beliefs as it was in O-Z- & I-Z-. Thus, Longchar is not entitled to a presumption of

19

a well-founded fear of future persecution.

As to a well-founded fear of future persecution, Longchar relies almost exclusively on the country reports indicating that Hindu extremists, who have ties to the national Indian government, have committed violence against Christians. In fact, as Longchar makes clear in his brief, he believes that merely "being a Christian" provides him with a well-founded fear of persecution. Since at least 23 million Christians currently reside in India, Longchar's suggestion without more that 23 million people are presently being persecuted is not warranted.

The objective evidence in the case consists of Longchar's testimony that his youngest brother-in-law had his home ransacked during a prayer meeting by the Indian army, and was then taken away when the army found a knife and accused him of being a member of a "freedom movement" against the Indian government. His brother, along with some others, were tortured for being freedom fighters of Nagaland. Longchar believes that the Indian army's battle against the freedom movement is just a pretext for persecuting Christians, but he offered no specific reason why. Longchar also testified that his uncle, who distributed Christian literature sent by Longchar to teach what Christianity was "all about," was beaten by the Indian army and later died. Longchar believes that the government would know that he distributed the Christian literature because his name was on the

20

address of the boxes.

The country reports indicate that India, as a whole, has problems with religiously motivated violence against both Muslims and Christians, although the number of attacks has decreased. The central government of India has received criticism for failing to restrain extremist Hindu groups, who appear to be responsible for the majority of the attacks. Christians, however, were also noted to be oppressors in regions where they constituted a majority. It is also noted that a 2004 report by the U.S. Commission on International Religious Freedom recommended placing India on the list of "Countries of Particular Concern." However, another report found that, in northern India, which is where Nagaland is located, only a few isolated incidents involving attacks on religious minorities were reported. The same report states that, "[d]espite the incidents of violence and discrimination during the period covered by this report, relations between various religious groups generally are amicable among the substantial majority of citizens."

It cannot be said that this record compels a reversal of the BIA's decision. The country reports, while they indicate that there is some violence towards Christians, also indicate that the incidents are more isolated than Longchar suggests. Given our deference to the BIA on factual findings, the reports alone are

not sufficient to compel a reversal here. Longchar's testimony, moreover, did not explain why it would be reasonable to believe that, out of a country of 1 billion people and 23 million Christians, the government or other Hindu extremists would specifically be interested in persecuting him, especially in light of the fact that he was last in his home country more than 10 years ago and has family there that have not been persecuted. While it is clear that there exist some Hindu extremist groups that have attacked Christians, and Longchar's subjective fears are understandable, the record does not suggest that Longchar is more likely to be targeted than the other 23 million Christians generally.

Finally, Longchar, perhaps in recognition of the fact that he cannot show that he is likely to be singled out individually, argues that there exists a "pattern and practice" of persecution of similarly situated people sufficient to show a reasonable possibility, and, therefore, a well-founded fear of persecution. Longchar relies on a First Circuit case, Perez-Alvarez v. I.N.S., 857 F.2d 23, 25 (1st Cir. 1988), for the proposition that, if 1 out of 10 persons in the applicant's country is in danger, the well-founded fear standard is met.

The First Circuit in Perez-Alvarez relied upon the Supreme Court's decision in I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) for its 1 in 10 language. See Perez-Alvarez, 857 F.2d at 25, citing Cardoza-

Fonseca, 480 U.S. at 431, 107 S.Ct. at 1213.  However, the passage cited in Cardoza-Fonseca is a secondary persuasive authority that did not ultimately become a part of the Supreme Court's holding that an alien claiming asylum is not statutorily required to show, as part of the "well-founded fear" requirement, that it is "more likely than not" that he will be persecuted if deported.  Cardoza-Fonseca, 480 U.S. at 449-50, 107 S.Ct. at 1222.  Thus, we decline to adopt the 1 in 10 requirement.

Even if we did adopt the 1 in 10 language, however, Longchar has cited to no evidence that would objectively prove that 1 out of 10 of the 23 million Christians in India, let alone members of religious minorities as a whole, are in danger because of their respective religions.  Hindus, according to the 2003 International Religious Freedom report, constitute the majority religion at 82 percent.  Assuming this is true, there are 180,000,000 people in India practicing non-Hindu religions,  but there is no evidence that 1 in 10 of them, which at a minimum would be 180,000 people, are being persecuted because of their non-Hindu religious beliefs.  Longchar has presented no evidence, even with the articles he submitted, to support his claim that he is entitled to asylum because of the "pattern and practice" rule promulgated by the First Circuit in Perez-Alvarez.  Simply stating that "religious strife is rampant in India, including hostility toward

23

Christians," is not sufficient to support his claim.

As to withholding of removal, because Longchar cannot meet the less stringent standard for proving he is entitled to asylum, he cannot demonstrate his entitlement to the more stringent "more likely than not" standard required for withholding of removal. See Al Najjar, 257 F.3d at 1303.

Based on the foregoing, we conclude that substantial evidence supported the BIA's determination that Longchar failed to prove past persecution, a well-founded fear of future persecution, or that it was more likely than not that he would be persecuted if returned to India. Accordingly, the petitioners failed to prove that they were entitled to either asylum or withholding of removal, and we, therefore, deny the petition.

**PETITION DENIED.**